**Jeffrey MANTZ, Plaintiff,**

**v.**

**Trooper Joseph CHAIN, Trooper Christine Shallcross, the New Jersey Highway Authority, and the State of New Jersey (through the Division of the State Police), j/s/a, Defendants.**

Civil Action No. 00–4032 (SSB).

United States District Court,
D. New Jersey.

Dec. 30, 2002.

Richard T. Fauntleroy, Law Offices of Richard T. Fauntleroy, P.C., Pleasantville, NJ, for Plaintiff.

Marcus H. Karavan, Marcus H. Karavan, P.C., Wildwood, NJ, for Defendants.

## OPINION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(c) AND PLAINTIFF'S CROSS-MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT.

BROTMAN, District Judge.

Plaintiff Jeffrey Mantz instituted this action against the New Jersey Highway Authority, the State of New Jersey, and New Jersey state troopers Joseph Chain and Christine Shallcross on August 18, 2000, asserting federal civil rights claims under 42 U.S.C. § 1983 for unlawful arrest, false imprisonment, excessive force, malicious prosecution, and denial of adequate medical care, as well as related state constitutional and tort claims, arising out of his arrest, detention, and prosecution for disorderly conduct pursuant to N.J.S.A. § 2C:33–2a ("Improper Behavior"). This Court has jurisdiction over Plaintiff's federal civil rights claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367. Presently before the Court is Defendants' motion for summary judgment and a cross-motion by Plaintiff for leave to file a second amended complaint. For the reasons set forth below, Defendants' motion for summary judgment will be granted in part and denied in part and Plaintiff will be granted leave to amend his complaint.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On February 6, 1999, at approximately 1:05 a.m., New Jersey state troopers, Joseph Chain and Christine Shallcross, stopped a vehicle observed driving "erratically" along a stretch of the Garden State Parkway in Somers Point, Atlantic County. (Chain Dep. at 52, 58; Certification of Marcus H. Karavan, Esq., Ex. 4 (hereinafter "Karavan Cert.")). The vehicle's two occupants, Robert Wood and the plaintiff, Jeffrey Mantz, were returning home after attending a rock concert in the Philadelphia area earlier that evening. (Mantz Dep. at 13). The troopers suspected that Wood, the driver of the car, had been drinking and asked that he and Mantz step out of the vehicle. Wood was then questioned and asked to submit to a series of field sobriety tests. (Karavan Cert., Ex. 4). The results of these tests confirmed the officers' suspicions and Wood was placed under arrest on suspicion of driving while under the influence of alcohol. (*Id.*). Mantz, who admits that he too had been drinking that night but denies the trooper's claims that he was heavily intoxicated (Mantz Dep. at 18–20; 24–25), was asked to produce identification, but was not placed under arrest. (Chain Dep. at 52, 62, 64; Mantz Dep. at 22). Both men were then transported to a state police substation located just off of the Parkway in Avalon, New Jersey, where Mantz was given the option of either calling a friend or family member to come pick him up or waiting until Wood had been "processed" so that one of the officers could drive him home. (Chain Dep. at 69; Mantz Dep. at 22). Mantz, who did not want to disturb any of his family or friends at such an

early hour, chose instead to wait at the station for a ride from one of the troopers. (Chain Dep. at 69).

Mantz and the two troopers offer dramatically different accounts of the events that transpired once the four arrived at the Avalon barracks. According to Mantz, once inside the station, he used the bathroom facilities without incident and then sat quietly on an L-shaped bench while Shallcross and Chain proceeded to process the drunk driving charges against Wood. (Mantz Dep. at 28; Chain Dep. at 70). After sitting for approximately an hour, Mantz asked for permission to step outside and have a cigarette, but Trooper Chain refused the request and warned him just to "sit there and shut the f**k up." (Mantz Dep. at 29, 35). When Mantz protested and demanded to know whether he was being placed under arrest or charged with a crime, Trooper Chain moved out from behind a counter where he and Shallcross had been processing Wood's paperwork, walked over to him, and said, "No, you're not under arrest, but we can arrange that." (Id. at 31). He then demanded that Mantz "[s]tand up and put his hands behind his back." (Id.). Mantz promptly complied and permitted Chain to handcuff him without incident. (Id.). Once Mantz's hands had been firmly secured behind his back, Chain pushed his face and left shoulder into the wall and then pulled out a can of "OC spray" (commonly known as "pepper" spray or "mace"), spraying him twice, once on the side of the head and once in the eyes. (Id. at 32).

Troopers Chain and Shallcross provide a very different account of Mantz's conduct and the actions they took in responding to it. In their written reports and deposition testimony, they observe that Mantz, who appeared to have been "drinking heavily," was "initially" very "calm," "polite," and "cooperative." (Chain Dep. at 70–71; Shallcross Dep. at 94). His behavior abruptly changed, however, after he was told that it would be unsafe for him to leave the station unattended in his intoxicated condition and his cigarette would have to wait until Wood was finished being processed. (Chain Dep. at 72; Shallcross Dep. at 94–95). He began cursing at Trooper Chain and demanding in a "loud" and "angry" tone that he be permitted to smoke his cigarette. (Chain Dep. at 72). After briefly calming down, his tone became "louder," "angrier," and "more threatening" and he once again began to shout and curse at Trooper Chain, complaining that his rights were being violated. (Id. at 73, 76).

As Mantz's conduct began to create an increasingly tense atmosphere, Trooper Shallcross was forced to stop her investigation so that she could re-secure Wood to the bench. (Shallcross Dep. at 116). Meanwhile, Trooper Chain told Mantz that his behavior was interfering with the processing of Wood's DUI charges and warned that if it continued, he would be placed under arrest for disorderly conduct. (Chain Dep. at 77). According to Chain's deposition testimony, upon hearing this, Mantz suddenly "jumped out of his chair" and "came at [him] in an aggressive posture" with his "face farther in front of his shoulders, eyes wide open, face fully flushed, arms back, shoulders back" and his palms facing upward toward the ceiling. (Id.). In response, Chain informed Mantz that he was being placed under arrest for disorderly conduct and briefly struggled with him before securing his hands behind his back with a pair of handcuffs. (Id. at 78–79; Shallcross Dep. at 129–132, 136).

Mantz continued to offer physical resistance as Chain attempted to secure him to the bench with another pair of handcuffs

and eventually managed to free himself, retreating to the other side of the room where he sat down in a chair and set about manipulating his handcuffs so that he could reposition his hands to the front of his body through his legs. (Chain Dep. at 80–82; Shallcross Dep. at 137–138). When Mantz was warned that if he continued to resist he would be sprayed with pepper spray, he became "enraged" and suddenly "sprang up" out of his chair in an "aggressive posture," cursing and spitting at Trooper Chain. Trooper Chain responded by discharging his pepper spray once directly into Mantz's face. (Chain Dep. at 82–84). The spray managed to "incapacitate" Mantz long enough for Chain to finish securing him to the bench. (Id. at 97).

After handcuffing Mantz to the bench, Trooper Chain opened the front door of the station to let some fresh air into the building. (Chain Dep. at 100). He also offered to provide him with some water to rinse out his eyes and a towel to wipe away any residue, but Mantz refused insisting that an ambulance be called so that he could be taken to hospital. (Mantz Dep. at 54; Chain Dep. at 101; Shallcross Dep. at 149). Chain and Shallcross did not immediately call an ambulance but instead called Mantz's girlfriend and asked her to retrieve him from the stationhouse. (Chain Dep. at 101–103). When she arrived at the station, Chain offered to release Mantz into her custody. (Id. at 122; Dep. of Karla Goodman at 27). Mantz, however, continued to insist on being transported to the hospital in an ambulance. (Mantz Dep. at 47).

The supervising officer on duty that evening arrived at the station sometime later and directed the troopers to remove Mantz's handcuffs. Shortly thereafter an ambulance arrived and transported Mantz to Burdette Tomlin Memorial Hospital where hospital staff provided him with a saline solution to flush out his eyes. (Id. at 54, 57). Mantz maintains that he continued to experience a burning sensation and blurred vision for "several days" after being released from the hospital and insists that his eyesight has never been the same. (Id. at 58–59).

Trooper Chain filed a criminal complaint later that same day accusing Mantz of "purposely caus[ing] a disturbance during the process of [a police] investigation ... by engaging in violent and threatening behavior ... which served no legitimate purpose ..." in violation of N.J.S.A. § 2C:33–2a ("Improper Behavior").[1] A summons was then issued requiring Mantz to appear in court to answer the allegations set forth in the complaint, but the charges were ultimately dismissed by Middle Township Municipal Court Judge Kenneth Calloway due to the State's failure to provide discovery after the scheduling of a firm trial date. (Certification of Richard T. Fauntleroy, Esq., Ex. E). Mantz thereafter filed a seven count complaint in this Court against the two troopers, the State of New Jersey, and the New Jersey Highway Authority, asserting civil rights claims under 42 U.S.C. § 1983, as well as several related state law causes of action. Counts I, II, and III of the complaint assert claims for false arrest, unlawful detention, excessive force and malicious prosecution against Trooper Chain pursuant to § 1983.

---

1. N.J.S.A. § 2C:33–2a states in pertinent part:
 a. Improper Behavior. A person is guilty of a petty disorderly persons offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he

(1) Engages in fighting or threatening, or in violent or tumultuous behavior; or

(2) Creates a hazardous or physically dangerous condition by any act which serves no legitimate purpose of the actor.

Count IV alleges that Trooper Shallcross "aided and abetted" violations of Mantz's constitutional rights by failing to intervene to prevent Trooper Chain from subjecting him to unlawful arrest and detention and excessive force. (Compl. at ¶ 27). Trooper Shallcross is also accused of violating Mantz's constitutional rights by "refusing or failing to provide medical assistance" or "call an ambulance" following his exposure to pepper spray. (*Id.* at 28). Counts V asserts state law claims for false arrest, unlawful detention, and excessive force, against both troopers, the State of New Jersey, and the New Jersey Highway Authority. Counts VI and VII assert state law claims for assault and battery and malicious prosecution against Trooper Chain, the State of New Jersey, and the New Jersey Highway Authority.

Defendants' now move for summary judgment with respect to the following claims: (1) Mantz's § 1983 claims against Trooper Chain for false arrest, unlawful detention, excessive force, and malicious prosecution (Def.'s Br. at 18–26);[2] (2) Mantz's § 1983 claim against Trooper Shallcross for allegedly denying him adequate medical care (*Id.* at 32); (3) Mantz's state law claim for assault and battery against Trooper Chain (*Id.* at 30); and (4)

Mantz's demand for punitive damages against both troopers, the State of New Jersey, and the New Jersey Highway authority (*Id.* at 34).[3] Mantz has filed a brief in opposition to Defendants' motion for summary judgment, along with a cross-motion for leave to file a second amended complaint "clarifying" his intention to sue Troopers Chain and Shallcross in both their official and individual capacities.

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

The standard for granting a motion for summary judgment is a stringent one, though it is not insurmountable. Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted only when the evidence contained in the record, including "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.* 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there are any disputed issues of material fact which must be re-

---

**2.** In their moving papers, Defendants' also move for summary judgment with respect to "Plaintiff's cause of action under 42 U.S.C. § 1983 against the New Jersey Highway Authority and the State of New Jersey." (Def.'s Br. at 15). However, upon reviewing Mantz's Amended Complaint, it appears that his federal civil rights claims are asserted exclusively against Troopers Chain and Shallcross. In any event, in his opposition brief, Mantz "concedes that any claims brought against [these] Defendants under 42 U.S.C. § 1983 must be dismissed." (Pl.'s Opp. Br. at 14). Accordingly, in order to avoid any further confusion, the Court will grant Defendants' motion for summary judgment insofaras Mantz's Amended Complaint seeks to hold either the State of New Jersey or the New

Jersey Highway Authority liable under § 1983.

**3.** Defendants do not specifically move for summary judgment with respect to the state law claims for false arrest, unlawful detention, excessive force, and malicious prosecution contained in Counts V and VII or the remaining § 1983 claims asserted in Count IV against Trooper Shallcross. Indeed, with the exception of Plaintiff's common law assault and battery claim (Count VI), the briefs submitted in support of Defendants' summary judgment motion focus almost exclusively on Plaintiff's federal civil rights claims against Trooper Chain. Defendants' motion is, therefore, in substance, a motion for *partial* summary judgment.

served for trial, the court must view the record in the light most favorable to the non-moving party, together with all reasonable inferences which can be drawn therefrom. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Indeed, relevant Supreme Court decisions mandate that a summary judgment motion be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict in favor of the nonmoving party.'" *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). In other words, the non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin*, 96 F.3d at 69 n. 2 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, if the non-movant's evidence on any essential element of the claims asserted is merely "colorable" or is "not significantly probative," the court must enter summary judgment in favor of the moving party. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *see also Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3dCir.1991) (observing that non-movant's effort to defeat summary judgment may not "rest upon mere allegations, general denials, or ... vague statements").

## III. DISCUSSION AND ANALYSIS

### A. QUALIFIED IMMUNITY FROM LIABILITY UNDER 42 U.S.C. § 1983

■ In moving for summary judgment of Mantz's civil rights claims under 42 U.S.C. § 1983, Defendants invoke the doctrine of qualified immunity. Under the doctrine of qualified immunity, law enforcement officers, like other public officials performing discretionary duties within the scope of their employment, are "shielded from liability for civil damages insofaras their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In determining whether a police officer is entitled to qualified immunity, both the existence of a clearly established right and the objective reasonableness of the officer's actions are questions of law for the Court to decide, but any disputed issues of historical fact relevant to the Court's determination must be submitted to the jury. *See Curley v. Klem*, 298 F.3d 271, 278 (3d Cir.2002) ("while we have recognized that it is for the court to decide whether an officer's conduct violated a clearly established right, we have also acknowledged that the existence of disputed historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue.").

■ Because qualified immunity is not merely a defense to liability, but "an entitlement not to stand trial or face the other burdens of litigation," *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), "the Supreme Court

has repeatedly stressed the importance of resolving immunity questions at the earliest possible stages of litigation" and often admonished courts to avoid routinely submitting the issue of immunity to the jury. *Curley,* 298 F.3d at 277. However, as the Third Circuit has recently observed, this "imperative" is frequently "in tension with the reality that factual disputes [relating to the circumstances surrounding an officer's actions] often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right." *Id.* at 278. In other words, "the standard for granting or denying a motion for summary judgment does not change in qualified immunity context." *Id.* (citing *Karnes v. Skrutski,* 62 F.3d 485, 494 (3d Cir.1995)). "Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." *Curley,* 298 F.3d at 278; *see also, Hill v. Algor,* 85 F.Supp.2d 391, 401 (D.N.J.2000) (Brotman, J.) (observing that "where factual issues relevant to the determination of qualified immunity are in dispute, the Court cannot resolve the matter as a question of law" on a motion for summary judgment).

■ When the doctrine of qualified immunity is raised by a law enforcement officer on a motion for summary judgment as a defense to alleged deprivations of constitutional rights under § 1983, the Court "must begin with this threshold question: do the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the officers conduct violated a constitutional right?" *Curley,* 298 F.3d at 277 (citing *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). If the plaintiff fails to allege the violation of a constitutional

right, no further inquiry is necessary. *Id.* If, however, the facts alleged are sufficient to demonstrate a constitutional violation, the court must proceed to determine whether the right asserted was "clearly established" at the time of the officer's allegedly unlawful conduct. *Id.* This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 194, 121 S.Ct. 2151. The question the court must consider is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 195, 121 S.Ct. 2151 (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). Thus, for purposes of this motion, Defendants are entitled to qualified immunity only if the Court can conclude, based on the undisputed facts in the record, that Defendants reasonably, though perhaps mistakenly, believed that their conduct was lawful in light of the clearly established law and the information known to them at the time of the alleged constitutional violation. The Court may not properly grant summary judgment on the basis of qualified immunity if the record compels the opposite conclusion or if there exist disputed issues of material fact relevant to the Court's evaluation of the "objective reasonableness" of the Defendants' conduct.

## B. FEDERAL CIVIL RIGHTS CLAIMS UNDER 42 U.S.C. § 1983

### i. False Arrest/Unlawful Detention

■ Counts I and II of Mantz's Amended Complaint assert claims for unlawful arrest and false imprisonment against Trooper Chain. As a key element of both of these claims, Mantz must establish that Chain acted without probable cause. *See Groman v. Township of Manalapan,* 47 F.3d 628, 636 (3d Cir.1995);

*Luthe v. City of Cape May,* 49 F.Supp.2d 380, 388 (D.N.J.1999) (citing *Sharrar v. Felsing,* 128 F.3d 810, 827 (3d Cir.1997)). To maintain a claim for unlawful arrest under § 1983, a plaintiff must prove that he was arrested by a state actor without probable cause. *Sharrar,* 128 F.3d at 817–18. Moreover, it follows that "[w]here the police lack probable cause to make an arrest, the arrestee [also] has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *Groman,* 47 F.3d at 636 (citing *Thomas v. Kippermann,* 846 F.2d 1009, 1011 (5th Cir. 1988)).

The Third Circuit has defined probable cause as follows:

> Probable cause to arrest requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt. Rather probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.

*Orsatti v. New Jersey State Police,* 71 F.3d 480, 482–83 (3d Cir.1995). "This standard is meant to safeguard citizens from rash and unreasonable interferences with [their liberty and] privacy and to provide leeway for enforcing the law in the community's protection." *Sharrar,* 128 F.3d at 817–18.

▮ In the instant case, Mantz was placed under arrest for allegedly engaging in "violent and threatening behavior" and interfering with the processing of Wood's DUI charges. A criminal complaint was then filed by Trooper Chain charging him with a "petty disorderly persons" offense pursuant to N.J.S.A. § 2C:33–2a ("Improper Behavior"). A person is guilty of such an offense if

> with the purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) engages in *fighting, threatening, violent or tumultuous* conduct, or (2) creates a *hazardous or physically dangerous condition* by an act serving no legitimate purpose of the actor.

N.J.S.A. 2C:33–2a (emphasis added); *State v. Stampone,* 341 N.J.Super. 247, 254, 775 A.2d 193 (App.Div.2001). In his deposition testimony, Trooper Chain explains that the "threatening and violent" behavior to which he refers in the complaint consisted of both "loud" and profane language and several sudden and "aggressive" movements which he interpreted as being both disruptive and physically threatening to his safety and that of his partner.[4] He further insists that he arrested Mantz only after he had repeatedly refused to obey several verbal warnings.

Mantz concedes that he "complained" when Trooper Chain refused to allow him to leave the substation. (Mantz Dep. at 31, 35). However, he denies either cursing or yelling at Trooper Chain prior to being handcuffed and placed under arrest. (*Id.* at 33). He also adamantly denies "rushing" or "jumping" at Trooper Chain or making any other physical movements that

---

4. While Trooper Chain's deposition testimony is replete with references to Mantz's alleged use of loud and offensive profanity, the criminal complaint he filed following the incident does not accuse Mantz of using "offensive language" under subsection b of New Jersey's "disorderly conduct" statute. *See* N.J.S.A. § 2C:33–2(b) ("A person is guilty of a petty disorderly persons offense, if in a public place, and with purpose to offend the sensibilities of a hearer or in reckless disregard of the probability of so doing, he addresses unreasonably loud and offensively coarse or abusive language, given the circumstances of the person present and of the setting of the utterance, to any person present.").

could have reasonably been interpreted as physically "threatening" or "violent." (*Id.* at 35).

This testimony, when viewed in the light most favorable to Mantz, the non-moving party, creates a genuine issue of material fact with respect to whether Trooper Chain possessed probable cause to arrest him for engaging in the type of "violent, threatening, or tumultuous" conduct prohibited by the "disorderly conduct" statute he was charged with violating. Moreover, because there exist in the record several disputed issues of fact regarding the circumstances surrounding Mantz's arrest, it would be premature, at this stage in the litigation, for the Court to make a determination with regard to the "objective reasonableness" of Trooper Chain's actions. Accordingly, the Court will deny summary judgment with respect to the claims for unlawful arrest and false imprisonment contained in Counts I and II of Mantz's Amended Complaint.

### ii. Excessive Force

■■■■ Count III of Plaintiff's Amended Complaint accuses Trooper Chain of using "excessive force" in acting to subdue and arrest him. Excessive force claims arising out of an arrest or other " 'seizure' of a free person" are analyzed under the Supreme Court's Fourth Amendment jurisprudence. *See Hill,* 85 F.Supp.2d at 399 (citing *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a "seizure" occurred and that it was "unreasonable" under the circumstances. *See Abraham v. Raso,* 183 F.3d 279, 288 (3d Cir.1999) (citing *Brower v. County of Inyo,* 489 U.S. 593, 599, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)).

■■■■ In determining whether the facts alleged establish a claim for excessive force, the question the Court must resolve is whether Trooper Chain's "actions [were] objectively reasonable in light of the facts and circumstances confronting him, regardless of his underlying intent or motivation." *Graham,* 490 U.S. at 397, 109 S.Ct. 1865. Whether the nature and extent of force used to subdue and arrest the plaintiff was "reasonable" will depend on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865. While this "reasonableness inquiry is objective, [it] should give appropriate scope to the circumstances of the police action, which are often 'tense, uncertain, and rapidly evolving.' " *Groman,* 47 F.3d at 634 (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865.).

In the instant case, Mantz alleges that Trooper Chain threw him against the wall and discharged pepper spray into his face after handcuffing his hands behind his back and that the use of such force was unreasonable and completely unprovoked by any conduct on his part. While he admits that he had been drinking earlier in the evening and that he "complained" repeatedly about Trooper Chain's refusal to allow him to step outside to smoke a cigarette, he adamantly denies offering any type of physical resistance during the course of the arrest. (Mantz Dep. at 31–32, 35). He also denies Trooper Chain's allegations that he assumed an "aggressive stance" and "lunged" in his direction and insists that any spitting was clearly not intentional. (*Id.* at 35).

For his part, Trooper Chain does not deny spraying Mantz with pepper spray after using restraints to secure both of his hands behind his back. He insists, howev-

er, that Mantz repeatedly refused to follow his verbal commands and physically resisted his efforts to handcuff him and secure him to the processing bench. (Chain Dep. at 78–91). He further maintains that he warned Mantz that pepper spray would be used if he refused to cooperate and that he discharged the spray only after Mantz made several aggressive and threatening movements and spat on him. (*Id.* at 83, 90).

A reasonable factfinder, accepting Mantz's testimony and discrediting Trooper Chain's account of his conduct during the course of the arrest, could conclude that Mantz did not pose a serious threat to the safety of the officers and that Chain's use of pepper spray to subdue him was "unreasonable," particularly when considering the nature of the alleged offense. *See Groman,* 47 F.3d at 637 (observing that disorderly conduct is not a particularly serious offense). Thus, there is sufficient evidence in the record to support Mantz's claim that Chain's actions violated his Fourth Amendment right to be free from excessive force. Furthermore, there are several disputed issues of material fact regarding the circumstances surrounding Trooper Chain's use of force and credibility determinations which the jury must resolve before the Court can properly determine whether he is entitled to qualified immunity. Accordingly, the Court will deny summary judgment with respect to Mantz's excessive force claim against Trooper Chain.

### iii. Malicious Prosecution

Count II of Mantz's Amended Complaint asserts a claim for malicious prosecution against Trooper Chain pursuant to § 1983. Specifically, Mantz alleges that Chain "caused a criminal complaint to be issued" against him knowing that he lacked probable cause to support the accusations contained therein and merely to "harass" him and "cover up his unlawful arrest . . . and use of excessive force." (Compl. at ¶ 21). The Court concludes, however, that the evidence in the record fails, as a matter of law, to establish a claim for malicious prosecution under § 1983, and will therefore grant summary judgment on this claim.

In the years prior to the Supreme Court's decision in *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), the Third Circuit Court of Appeals distinguished itself as having the "most expansive" view of malicious prosecution claims under § 1983. *Id.* at 270 n. 4, 114 S.Ct. 807 (citing *Lee v. Mihalich,* 847 F.2d 66, 70 (3d Cir.1988)); *see also Michaels v. New Jersey,* 50 F.Supp.2d 353, 366 (D.N.J. 1999). A plaintiff asserting a malicious prosecution claim under § 1983 in this jurisdiction could establish such a claim simply by alleging the traditional common law elements of the tort—that is, a plaintiff was required to establish only that: (1) defendants initiated a criminal proceeding against him; (2) without probable; (3) with malice or for reasons other than to bring the party to justice; and (4) that the proceedings were terminated in his favor. *See Lee,* 847 F.2d at 69–70; *see also Gallo v. City of Philadelphia,* 161 F.3d 217, 221 (3d Cir.1998) (same). By proving a violation of the common law tort, the Court of Appeals reasoned, a plaintiff would necessarily establish a violation of substantive due process that could form the basis for a civil rights claim under § 1983. *See Donahue v. Gavin,* 280 F.3d 371, 379 (3d Cir. 2002); *see also Gallo,* 161 F.3d at 221 (citing *Lippay v. Christos,* 996 F.2d 1490, 1502 (3d Cir.1993)).

The Supreme Court's decision in *Albright,* however, "significantly changed that legal landscape," narrowing the circumstances under which a plaintiff could maintain a claim for malicious prosecution

under § 1983. *Donahue,* 280 F.3d at 379. *Albright* involved a § 1983 malicious prosecution claim arising out of the initiation of state criminal proceedings on charges that were ultimately determined to be without any foundation in state law. The petitioner, Albright, had voluntarily surrendered to law enforcement authorities in Illinois shortly after learning that a warrant had been issued for his arrest on felony drug charges. He was briefly incarcerated after turning himself in and later released on bail pending trial. The charges were eventually dismissed, however, following a pre-trial hearing in which the trial judge made a determination that the conduct Albright had been accused of in the indictment did not constitute a criminal offense under Illinois state law. Albright, thereafter filed a civil rights action under § 1983, alleging that the police officer who had obtained the arrest warrant had deprived him of his substantive due process right under the Fourteenth Amendment to be "free from criminal prosecution except upon probable cause." 510 U.S. at 269, 114 S.Ct. 807. Albright's suit was dismissed by the Court of Appeals for the Seventh Circuit on the ground that he had "failed to show incarceration, loss of employment, or some other 'palpable consequence' caused by the prosecution." *Id.* at 269–270, 114 S.Ct. 807.

The Seventh Circuit's dismissal of Albright's claim was narrowly affirmed on appeal to the United States Supreme Court by a plurality of four justices. Writing for the plurality, Chief Justice Rehnquist first observed that the issue before the Court was a "very limited one," as Albright's complaint had not raised any procedural due process or Fourth Amendment claims, but instead relied entirely on the substantive guarantees of the Fourteenth Amendment's Due Process Clause. *Id.* at 271, 114 S.Ct. 807. The Court, he noted, had, in past opinions, often expressed a reluctance to expand the concept of substantive due process beyond "matters relating to marriage, family, procreation, and the right to bodily integrity." *Id.* at 271–72, 114 S.Ct. 807. After observing that the Albright's claimed right "to be free from prosecution except on the basis of probable cause" failed to resemble the types of rights and interests which the Court's prior decisions had found to be deserving of substantive due process protections, the plurality upheld the dismissal of Albright's claim and held "that the substantive due process [component of the Fourteenth Amendment], with its 'scarce and open-ended' guideposts [could] afford [Albright] no relief." *Id.* at 275, 114 S.Ct. 807. In order to elevate a malicious prosecution claim from a mere tort to a constitutional violation, the Court reasoned, such a cause of action must be based upon the alleged violation of a constitutional amendment which "provides an explicit textual source of constitutional protection against a particular sort of government behavior," and not on the more "generalized" and elastic concept of substantive due process. *Id.* at 273, 114 S.Ct. 807. For instance, while declining to expressly decide the issue, the Court suggested that the constitutional injury about which Albright complained—*i.e.,* being compelled to surrender to law enforcement authorities on an outstanding arrest warrant unsupported by probable cause—may have implicated the protections of the Fourth Amendment's prohibition against unreasonable searches and seizures. *Id.* at 274, 114 S.Ct. 807 ("We have in the past noted the Fourth Amendment's relevance to [pre-trial] deprivations of liberty that go hand in hand with criminal prosecutions.") (citing *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)).

The decision in *Albright,* as it has been interpreted and applied by the Court

of Appeals, clearly forecloses malicious prosecution claims which rely exclusively on the substantive component of the Fourteenth Amendment's Due Process Clause. *See Merkle v. Upper Dublin Sch. Dist.,* 211 F.3d 782, 792 (3d Cir.2000) ("In *Albright,* the Court held that a claim of malicious prosecution under section 1983 cannot be based on substantive due process considerations, but instead must be based on a provision of the Bill of Rights providing an explicit textual source of constitutional protection."). Thus, to maintain a malicious prosecution claim under § 1983 in the wake of *Albright,* a plaintiff must do more than simply offer proof of that tort's common law elements. *See Roche v. John Hancock Mut. Life Ins.,* 81 F.3d 249, 256 (1st Cir.1996) (explaining that "a garden-variety claim of malicious prosecution garbed in the regalia of § 1983 must fail"); *see also Hassoun v. Cimmino,* 126 F.Supp.2d 353, 362 (D.N.J.2000). Rather, plaintiff must allege facts sufficient to establish a violation of the Fourth Amendment's prohibition against "unreasonable seizures" or some other explicit text of the Constitution, such as the procedural component of the Due Process Clause. *See Merkle,* 211 F.3d at 792.

Here, Mantz's complaint makes reference to the Fourth, Fifth, and Fourteenth Amendments. (Compl. at ¶ 22). However, neither the allegations in the complaint nor the evidence in the record contain any of the facts necessary to establish a denial of procedural due process or a violation of the protections of the Fifth Amendment. Indeed, it is clear from the nature of the allegations in Mantz's complaint, as well as the arguments asserted in his opposition brief, that his malicious prosecution claim seeks to vindicate rights guaranteed to him under the Fourth Amendment. (*See* Compl. at ¶¶ 19, 21–22; Pl.'s Opp. Br. at 25 ("Defendant violated the plaintiff's Constitutional Rights by the malicious

prosecution of him without probable cause in violation of the Fourth Amendment.")). Accordingly, the Court will evaluate Mantz's malicious prosecution claim under the Fourth Amendment.

■■■■ In order to establish a prima facie claim for malicious prosecution under the Fourth Amendment, a plaintiff must establish both the common law elements of the tort and "some deprivation of liberty that rises to the level of Fourth Amendment 'seizure ...'" *See Torres v. McLaughlin,* 163 F.3d 169, 175 (3d Cir. 1998); *Gallo,* 161 F.3d at 222; *see also Russoli v. Salisbury Twp.,* 126 F.Supp.2d 821, 853–54 (E.D.Pa.2000) ("Absent any constitutionally significant pre-trial restraints on plaintiff's liberty, the weight of federal authority holds that a person may not maintain a § 1983 claim for malicious prosecution under the Fourth Amendment."). This is because the type of constitutional injury which the Fourth Amendment is intended to redress is "the deprivation of liberty accompanying the prosecution," rather than the prosecution itself. *Gallo,* 161 F.3d at 222.

■■■■ Furthermore, not all Fourth Amendment "seizures" can serve as the basis for a malicious prosecution claim. Rather, "[b]ecause ... the tort of malicious prosecution concerns the 'perversion of proper legal procedures,' [plaintiff] must show that he suffered a seizure *as a consequence of a legal proceeding.*" *Gallo,* 161 F.3d at 222 (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 116 (2d Cir.1995)) (emphasis added); *see also Nieves v. McSweeney,* 241 F.3d 46, 54 (1st Cir.2001). The "offending legal process [generally] comes either in the form of an arrest warrant (in which case the arrest would constitute the seizure) or a subsequent charging document (in which case the sum of post-arraignment deprivations would

comprise the seizure)." *Nieves*, 241 F.3d at 54 (citing *Singer*, 63 F.3d at 117); *see also Estate of Smith v. Marasco*, 227 F.Supp.2d 322, 345–47 (E.D.Pa.2002).

The summary judgment record in the instant case establishes the following facts: Mantz was arrested without a warrant for allegedly engaging in "disorderly conduct," but was soon thereafter released on his own recognizance so that he could receive medical treatment for exposure to pepper spray. A criminal complaint was filed later that same day and a summons was issued requiring Mantz to appear in court on a specified date to answer the charges against him. The record does not contain any evidence that Mantz's appearance in court was secured by means of bail, a warrant, incarceration, or restrictions on his travel. Because the Court concludes that these facts fail to establish the type of "seizure" required to maintain a claim for malicious prosecution under the Fourth Amendment, the Court will grant summary judgment with respect to this claim.

 The Court observes, at the outset, that Mantz's arrest, while clearly a seizure within the meaning of the Fourth Amendment, *see Russoli*, 126 F.Supp.2d at 840 ("Arrests made by police officers are classic seizures within the meaning of the Fourth Amendment") (citing *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), was not made pursuant to a warrant and occurred prior to filing of the criminal complaint, and cannot therefore serve as the basis for his malicious prosecution claim. *See Nieves*, 241 F.3d at 54 (noting that "Appellants were arrested without a warrant and, thus, their arrests—which antedated any legal process—cannot be part of the Fourth Amendment seizure upon which they base their section 1983 [malicious prosecution] claims."); *Singer*, 63 F.3d at 116 (concluding that the plaintiff's arrest could not

"serve as the predicate deprivation of liberty [for a § 1983 malicious prosecution claim] because it occurred prior to his arraignment and without a warrant"); *Estate of Smith*, 227 F.Supp.2d at 345–47, (concluding that seizure which occurred without a warrant and prior to the filing of criminal complaint could not provide the basis for a § 1983 malicious prosecution claim); *Mateiuc v. Hutchinson*, 1998 WL 240331 at *3 (E.D.Pa. May 14, 1998) (observing that while a wrongful warrantless arrest may give rise to a claim for false arrest, it cannot serve as the basis for a § 1983 malicious prosecution claim). The question before the Court is therefore a rather narrow one: whether the filing of a criminal complaint and the issuance of a summons obligating Mantz to appear in court to answer the charges against him imposed restraints on his liberty sufficient to establish a "seizure" within the meaning of the Fourth Amendment.

As is clear from the Third Circuit's decision in *Gallo*, the protections of the Fourth Amendment may be triggered by something less than forcible detention. The "post-indictment liberty" of the plaintiff in *Gallo* was restricted in the following ways: he had to post a $10,000 bond and attend all court hearings over an eight and a half month period, including his trial and arraignment; he was required to contact pre-trial services on a weekly basis; and he was prohibited from traveling outside New Jersey or Pennsylvania. 161 F.3d at 222. The Court of Appeals, while characterizing the issue as a "close question," concluded that the "combination" of restrictions imposed on Gallo's liberty amounted to a "seizure" under the Fourth Amendment. *Id.* at 225 (observing that "Gallo's liberty was restrained in multiple ways for an extended period of time"). The Court noted that this holding was consistent with its pre-*Albright* jurispru-

dence. *Id.* at 224 ("Given that the Supreme Court decision in *Albright* does not determine conclusively what kinds of Fourth Amendment violations would be actionable under § 1983, we would remain closest to our own precedent by adopting a broad approach.").

*Gallo* does not directly address whether the issuance of a summons and the attendant obligation to appear in court will, by itself, constitute the seizure necessary to maintain a malicious prosecution claim under § 1983, and those courts in this jurisdiction which have had occasion to consider this issue have reached different conclusions. *Compare Colbert v. Angstadt,* 169 F.Supp.2d 352, 356 (E.D.Pa. 2001) (finding no seizure where "no [pretrial]" restrictions were imposed on [plaintiff's] liberty "other than the legal obligation to appear in court at a future date"); *Bristow v. Clevenger,* 80 F.Supp.2d 421, 430 (M.D.Pa.2000) (concluding that the obligation to attend court hearings did not effect a "seizure" where plaintiff was not required to post bail and did not have his "freedom of movement ... confined to any geographic area") *with Vassallo v. Timoney,* 2001 WL 1243517 at *7 (E.D.Pa. Oct.15, 2001) (observing that "plaintiff's obligation to go to court and answer the charges against him" constitutes a seizure); *Williams v. Fedor,* 69 F.Supp.2d 649, 670 (M.D.Pa. 1999) (holding that the requirements inherent in the criminal process—that the accused submit to processing and appear in court as required—are sufficient restraints on liberty to constitute a seizure under the Fourth Amendment).

This Court is inclined to agree with those courts which have held, as has the Court of Appeals for the First Circuit, that the issuance of a summons requiring a criminal defendant to appear in court on a specific date does not, by itself, amount to a "seizure" under the Fourth Amendment. *See Britton v. Maloney,* 196 F.3d 24, 30 (1st Cir.1999) (holding that the legal obligation imposed on plaintiff by a summons to appear in court on a future date was "insufficient to amount to a seizure within the meaning of the Fourth Amendment"); *Cf. DePiero v. City of Macedonia,* 180 F.3d 770, 789 (6th Cir.1999) (observing that the issuance of traffic citation did not amount to a seizure until plaintiff failed to appear in court and was served with a bench warrant authorizing the police to take him into custody and compel his appearance in court). The Third Circuit's opinion in *Gallo,* while endorsing a "broad" understanding of the concept of seizure, does not dictate the opposite conclusion. To the contrary, by describing as "close" the question of whether the "multiple" restraints placed on Gallo's liberty amounted to a seizure, the Court's opinion strongly implies that less onerous limitations on a criminal defendant's liberty will be insufficient to trigger the protections of the Fourth Amendment. Indeed, as Judge Rambo observed in *Bristow,* much of the Court's detailed analysis in *Gallo* would be rendered superfluous were courts in this jurisdiction to subscribe to the view that a Fourth Amendment seizure occurs every time a criminal defendant is required to appear in court. 80 F.Supp.2d at 430. Moreover, such an expansive view of the concept of seizure would effectively eliminate any meaningful distinction between a Fourth Amendment malicious prosecution claim and the common law tort, a result which would appear to seriously undermine the Supreme Court's decision in *Albright. See id.* For these reasons, the Court concludes that Mantz was not subjected to a Fourth Amendment seizure and cannot, therefore, maintain a claim for malicious prosecution pursuant to § 1983. Accordingly, the Court will grant Defendants' motion for summary judgment to

the extent that it seeks dismissal of the § 1983 malicious prosecution claim asserted in Count II of Mantz's Amended Complaint.

### iv. Denial of Medical Care

The allegations in Count IV of Mantz's Amended Complaint accuse Trooper Shallcross of violating his constitutional rights by failing to immediately call an ambulance following his exposure to pepper spray. (Compl. at ¶ 28). Delaying medical care to an individual in police custody can constitute a constitutional violation under § 1983 only if that delay "rises to the level of deliberate indifference to that person's serious medical needs." *Groman*, 47 F.3d at 637; *see also Hill*, 85 F.Supp.2d at 409 ("the deliberate indifference standard governs claims . . . arising out of one's arrest and post-arrest detention"). This standard is in effect a two-pronged test requiring that plaintiff prove: (1) that his medical needs were "objectively serious" and (2) that defendant exhibited "deliberate indifference" to those needs. *See Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir.1987). Where, as here, plaintiff alleges only a delay in calling for emergency medical assistance and not an outright denial of medical care, the "objective seriousness of the deprivation should . . . be measured 'by reference to the effect of the delay in treatment.'" *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995) (quoting *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1188 (11th Cir.1994)). In order to establish that the defendant acted with the requisite degree of culpability, plaintiff must demonstrate that she "knew that he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it." *Debro v. Roth*, 1997 WL 327487 at *3 (E.D.Pa. June 13, 1997) (citing *Farmer v. Brennan*,

511 U.S. 825, 836–37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

The evidence in the record currently before the Court is clearly insufficient to satisfy either prong of the "deliberate indifference" standard. Mantz concedes that less than an hour and a half elapsed between his exposure to the pepper spray and the arrival of the ambulance at the police sub-station and that, during that time, he stubbornly refused the troopers' offers to provide him with a towel and water to flush out his eyes and alleviate the painful effects of the pepper spray, precisely the same type of treatment provided by the hospital staff upon his arrival at Burdette Tomlin's emergency room. (Pl.'s Opp. Br. at 29–30; Mantz Dep. at 54, 57). On these facts, no reasonable jury could conclude that Trooper Shallcross's actions constituted the type of deliberate indifference necessary to establish an actionable constitutional claim. *See Groman*, 47 F.3d at 637 (affirming grant of summary judgment with respect to plaintiff's allegations of "deliberate indifference" where the "record clearly establishe[d] that the police offered [plaintiff] medical assistance which he consistently and obstinately rejected."); *see also Bustamante v. City of Chicago Police Dep't*, 1993 WL 369325 at *3 (N.D.Ill. Sept.20, 1993) (concluding that a one and a half hour delay in obtaining medical care for a detainee whose jaw was broken by a police officer during interrogation did not state a constitutional violation). Furthermore, Mantz has failed to provide any medical evidence, beyond his own subjective testimony, that Trooper Shallcross's alleged delay in responding to his demands for an ambulance caused him to suffer harm which he would not have suffered had an ambulance been immediately called to the scene. *See Beyerbach*, 49 F.3d at 1326 (a plaintiff "who complains that a delay in medical treatment rose to a constitutional

violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed") (emphasis added); *see also Langston v. Peters,* 100 F.3d 1235, 1240–41 (7th Cir.1996) (rejecting allegations of "deliberate indifference" where plaintiff "failed to present any evidence of a detrimental effect caused by the one hour between the time [he] notified [the defendant] and the time [the defendant] notified the medical technician"); *Hill,* 40 F.3d at 1191 (finding no deliberate indifference where plaintiff "submitted no medical evidence explaining how the four-hour delay in taking [him] to the hospital detrimented or worsened his medical condition"); *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 208 (1st Cir.1990) (per curiam) (while hospital records showed that arrestee displayed multiple bruises to the forehead, left ribs, right flank and left shoulder, and was suffering from abrasions to the cornea and upper back, consistent with plaintiff's allegations that he had been assaulted by police officer, there was "nothing in the record to suggest" that a ten-hour delay in medical treatment exacerbated these injuries "in the slightest"); *Martin v. Tyson,* 845 F.2d 1451, 1458 (7th Cir.1988) (rejecting allegations of deliberate indifference arising out alleged delay in providing medical treatment based, in part, on plaintiff's failure to produce any evidence of injury caused by the delay). Accordingly, the Court will grant summary judgment with respect to that part of Count IV which accuses Trooper Shallcross of exhibiting deliberate indifference to Plaintiff's medical needs.

## C. PLAINTIFF'S CROSS–MOTION FOR LEAVE TO AMEND

■■■■ Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely granted when justice so requires." Consistent with this standard, the Third Circuit has encouraged courts to grant leave where doing so will facilitate the resolution of cases "on the merits rather than on technicalities." *See Dole v. Arco Chemical Co.,* 921 F.2d 484, 487 (3d Cir.1990); *Bechtel v. Robinson,* 886 F.2d 644, 652 (3d Cir.1989); *In re Ford Motor Co. Ignition Switch Products Liab. Litig.,* 39 F.Supp.2d 458, 467 (D.N.J.1999); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."). Additionally, leave may be granted at any time during the litigation, even after judgment or on appeal. *See Doe v. Division of Youth and Family Services,* 148 F.Supp.2d 462, 477 (D.N.J.2001) (citing 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1488 (West 1990)). The decision whether to grant or deny a motion for leave to amend is within the sound discretion of the court. *See Cureton v. Nat'l Collegiate Athletic Ass'n,* 252 F.3d 267, 272 (3d Cir.2001); *Oran v. Stafford,* 226 F.3d 275, 291 (3d Cir.2000).

■■■■ Prejudice is generally considered the "touchstone" for denying a request for leave to amend. *See Heyl & Patterson Int'l, Inc. v. F.D. Rich, Inc.,* 663 F.2d 419, 425 (3d Cir.1981) (citing *Cornell & Co. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1989)). Thus, the mere passage of time will rarely be a sufficient basis for denying leave to amend. *Cureton,* 252 F.3d at 273 ("delay alone is an insufficient ground to deny leave to amend"). A motion for leave to amend may, however, be denied on the grounds of "undue delay" where permitting amendment of the complaint would result in prejudice to the

rights and interests of the non-moving party. *Id.* In this instance, the "non-moving party must do more than simply claim prejudice; it must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been timely." *Bechtel,* 886 F.2d at 652; *Johnson v. Trueblood,* 629 F.2d 287, 297 (3d Cir.1980) (noting that while the "exact nature and degree of prejudice necessary for a denial of an amendment is not readily susceptible to a precise formula ... defendants must show that the amendment would adversely affect their ability to defend adequately the case.").

Mantz moves, pursuant to Rule 15(a), to amend his complaint "to clarify that he is bringing this action against [Troopers Chain and Shallcross] in both their official and individual capacities." (Pl.'s Opp. Br. at 37). Defendants argue that permitting Mantz to amend his complaint at this late stage in the litigation would unfairly prejudice them by necessitating additional discovery and a dramatic shift in their litigation strategy. The Court, however, finds Defendants' claims of prejudice unpersuasive as it appears that the amendments sought by Mantz would merely state explicitly what has been apparent to the parties throughout the course of the proceedings in this litigation.

The distinction between official capacity suits and personal capacity actions is an important one because it may affect the type of relief and defenses available to the parties in a § 1983 action.[5] Because of the significance of this distinction, it is important that a defendant be given "adequate notice" that he or she is being sued in her personal capacity. *See Melo v. Hafer,* 912 F.2d 628, 636 n. 7 (3d Cir.1990). However, while Courts of Appeal in some jurisdictions require the complaint to explicitly identify the capacity in which a defendant is being sued, the Third Circuit has adopted a "more flexible approach," instructing courts to carefully examine the nature of the relief sought in the complaint and the parties conduct throughout the "course of the proceedings." *Id.* at 635–36 n. 7; *see also Gregory v. Chehi,* 843 F.2d 111, 119–120 (3d Cir.1988) (where "plaintiff's federal court complaint is deficient in failing to indicate whether he sues the individual defendants in their official or personal capacities," the court must "interpret the pleadings to ascertain what plaintiff should have stated specifically").

In the instant case, while the complaint fails to specify the capacity in which Defendants Chain and Shallcross are being sued, Mantz's § 1983 claims have, since the filing of his original complaint, included a demand for punitive or exemplary damages—a form of relief available only in personal capacity suits. *See Gregory,* 843 F.2d at 120. In addition, each of these claims requests damages only against the two troopers and not against either the State of New Jersey or the New Jersey Highway Authority. Thus, the complaint, when read with the sort of flexibility encouraged by the Court of Appeals, clearly

---

**5.** Personal capacity suits under § 1983 "seek to recover money from a government official, as an individual, for acts performed under color of state law." *Gregory v. Chehi,* 843 F.2d 111, 120 (3d Cir.1988); *see also Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (noting that to establish personal liability under § 1983 "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right"). Official capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent ... [A]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Chehi,* 843 F.2d at 120.

evinces an intent to hold Chain and Shallcross personally liable for their actions. *Melo*, 912 F.2d at 636 (noting that § 1983 claims which requested monetary damages "only from [defendant] and not from the state" reflected an intent to sue defendant in her individual capacity); *Gregory*, 843 F.2d at 120–121 (finding it "clear" that the individual defendants were "not sued solely in their official capacities" where the complaint sought "from each of them punitive, as well as compensatory, damages"). Indeed, Defendants invocation of the doctrine of qualified immunity—a defense relevant only to individual capacity suits—is a strong indication that they recognized as much. *Melo*, 912 F.2d at 636 ("It appears that [defendant] understood that plaintiffs sought to sue her in her personal capacity because she raised the defense of qualified immunity throughout the course of these proceedings, a defense available only for government officials when they are sued in their personal, and not in their official, capacity."). Accordingly, although the Court is reluctant to countenance Mantz's failure to resolve this ambiguity in his first two complaints, the Court finds Defendants' claims of prejudice unavailing and will, therefore, exercise its discretion to grant him leave to file a second amended complaint explicitly identifying the capacity in which Defendants Chain and Shallcross are being sued.

### D. STATE LAW CLAIMS

#### i. *Count VI: Assault and Battery*

 In Count VI of his Amended Complaint, Mantz alleges that Trooper Chain intentionally and maliciously committed an "assault and battery" against him. When effecting an arrest, a police officer may use such force as is reasonably necessary under the circumstances. *See Hill*, 85 F.Supp.2d at 411 (citing *State v. Williams*, 29 N.J. 27, 148 A.2d 22 (1959)). To determine whether the force used was excessive, it is necessary to examine "the facts as they reasonably appeared to the officer at the time of the occurrence." *Id.* Where a police officer uses excessive force in effectuating an arrest, that officer may be liable for assault and battery. As the Court has already indicated, the summary judgment record in this case contains several disputed issues of fact with regard to the circumstances surrounding Mantz's arrest and the extent to which he offered resistance to Trooper Chain's efforts to detain him, making it impossible for the Court to determine at this time the nature and amount of force which would have been reasonable under the particular circumstances of this case.

Trooper Chain contends that he enjoys immunity from Mantz's common law assault and battery claim under the New Jersey Tort Claims Act ("TCA"). Under the TCA, a public employee is generally "liable for injury caused by his act or omission to the same extent as a private person." N.J.S.A. § 59:3–1(a). However, the provisions of the Act immunize from liability public employees who have acted "in good faith in the execution or enforcement of any law." N.J.S.A. § 59:3–3.[6]

---

**6.** The Act further provides that a public employee will not liable for an injury where a public entity is immune from liability for that injury. N.J.S.A. § 59:3–1(c). A "public entity" includes the "State, and any county, municipality, district, public authority, public agency, and any other political subdivision or public body in the State." N.J.S.A. § 59:1–3.

As a general rule, however, a "public entity is liable for an injury that is proximately caused by an act or omission of a public employee within the scope of his employment 'in the same manner and to the same extent as a private individual under like circumstances.'" *Doe*, 148 F.Supp.2d at 493 (quoting N.J.S.A. 59:2–2). For purposes of the

The same "objective reasonableness" standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under N.J.S.A. § 59:3-3. *See Lear v. Township of Piscataway*, 236 N.J.Super. 550, 553, 566 A.2d 557 (App. Div.1989). Therefore, the same uncertainty that prevents the Court from determining as a matter of law whether officer Chain enjoys qualified immunity with regard to Mantz's § 1983 claim also prevents the Court from determining as a matter of law whether the TCA shields him from liability for allegedly assaulting Mantz.

■ Moreover, the provisions of the TCA strip a public employee of any immunity if that employee is found to have engaged in "willful misconduct." N.J.S.A. § 59:3-14(a). Willful misconduct is "'the commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden' ... [I]t requires much more than an absence of good faith and 'much more' than negligence." *PBA Local No. 38 v. Woodbridge Police Dep't*, 832 F.Supp. 808, 830 (D.N.J.1993) (quotations omitted). As there exists a genuine issue of material fact regarding whether Trooper Chain engaged in willful misconduct, the Court cannot determine as a matter of law whether the TCA shields him from liability for his use of force against Mantz. Accordingly, the Court will deny Trooper Chain's motion for summary subject with respect to the assault and battery claim contained in Count VI of Plaintiff's Amended Complaint.

*ii. Punitive Damages*

■ Defendants also move for partial summary judgment with respect to the demand for punitive damages contained in each of Plaintiff's state law claims. Defendants contend that the New Jersey Tort Claims Act bars Mantz from collecting punitive damages against any of the defendants. However, while the TCA expressly bars recovery of punitive damages against public entities, N.J.S.A. § 59:9-2(c) ("No punitive or exemplary damages may be awarded against a public entity"), the New Jersey courts have held that "no such immunity exists [under the TCA] for public employees." *Wildoner v. Borough of Ramsey*, 316 N.J.Super. 487, 508, 720 A.2d 645 (App.Div.1998) (citing *Marion v. Borough of Manasquan*, 231 N.J.Super. 320, 333, 555 A.2d 699 (App.Div.1989), *rev'd on other grounds*, 162 N.J. 375, 744 A.2d 1146 (2000)); *see also Ramirez v. United States*, 998 F.Supp. 425, 438 (D.N.J.1998) (Walls, J.). Defendants are, therefore, entitled to summary judgment to the extent that Mantz seeks to recover punitive damages against the State of New Jersey and the New Jersey Highway Authority. The Court will, however, deny Defendants' motion for summary judgment with respect to his punitive damage claims against Troopers Chain and Shallcross.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment will be granted in part and denied in part and Plaintiff will be granted leave to file a second amended complaint explicitly iden-

TCA, "acts that are committed within the scope of employment 'are those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.'" *Hill*, 85 F.Supp.2d at 412 (quoting *PBA Local 38 v. Woodbridge Police Dept.*, 832 F.Supp. 808, 829–30 (D.N.J.1993)). There is no dispute that the actions Trooper Chain took with regard to Mantz were taken as part of his job as a state law enforcement officer.

tifying the capacity in which Defendants Chain and Shallcross are being sued. The Court will enter an appropriate order.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S CROSS-MOTION TO FILE A SECOND AMENDED COMPLAINT

THIS MATTER having come before the Court on Defendants' motion for summary judgment and Plaintiff's cross-motion for leave to file a second amended complaint;

The Court having considered the submissions of the parties; and

For the reasons set forth in the Court's opinion of this date;

IT IS on this 30th day of December, 2002, HEREBY

ORDERED that Defendants' motion for summary judgment is **GRANTED** in so far as Plaintiff's Amended Complaint seeks to impose liability on the State of New Jersey and the New Jersey Highway Authority under 42 U.S.C. § 1983; and

IT IS FURTHER ORDERED THAT the part of Defendants' motion which seeks summary judgment with respect the § 1983 claims for unlawful arrest, false imprisonment, and excessive force contained in Counts I, II, and III of Plaintiff's Amended Complaint is **DENIED;** and

IT IS FURTHER ORDERED THAT the part of Defendants' motion which seeks summary judgment with respect to the § 1983 malicious prosecution claim against Trooper Chain contained in Count II of Plaintiff's Amended Complaint is **GRANTED;** and

IT IS FURTHER ORDERED THAT the part of Defendants' motion which seeks summary judgment with respect to

that portion of Count IV of Plaintiff's Amended Complaint which accuses Defendant Shallcross of denying Plaintiff adequate medical care is **GRANTED;** and

IT IS FURTHER ORDERED THAT the part of Defendants' motion which seeks summary judgment with respect to the demand for punitive damages against the State of New Jersey and the New Jersey Highway Authority contained in Counts V, VI, and VII of Plaintiff's Amended Complaint is **GRANTED;** and

IT IS FURTHER ORDERED THAT the part of Defendants' motion which seeks summary judgment with respect to the demand for punitive damages against Troopers Chain and Shallcross contained in Counts V, VI, and VII of Plaintiff's Amended Complaint is **DENIED;**

IT IS FURTHER ORDERED THAT Plaintiff's cross-motion for leave to file a second amended complaint explicitly identifying the capacity in which Defendants Chain and Shallcross are being sued is **GRANTED** provided that Plaintiff's amended complaint is filed within ten (10) days from the date of this order.

No costs.